**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RONNOCO COFFEE, LLC,<br>d/b/a RONNOCO BEVERAGE<br>SOLUTIONS, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:21-CV-00071 JAR |
| | ) | |
| KEVIN CASTAGNA and<br>JEREMY TORRES, | ) ) | |
| | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM AND ORDER**</u>

This matter is before the Court on Plaintiff Ronnoco Coffee LLC ("Ronnoco")'s Motion for Temporary Restraining Order and Preliminary Injunction (Doc. No. 7) and Defendants Kevin Castagna ("Castagna") and Jeremy Torres ("Torres")'s Motion to Dismiss for Lack of Jurisdiction and Venue (Doc. No. 13). The Court heard oral argument via video-conference on Ronnoco's Motion for Temporary Restraining Order on February 2, 2021. Plaintiff appeared by counsel James Martin; Defendants appeared in person and by counsel Mark Molner. Following oral argument, the Court entered a briefing schedule for the parties' respective motions. (Doc. No. 16). The motions are now fully briefed and ready for disposition.[1] For the following reasons, the Court denies Defendants' motion to dismiss for lack of jurisdiction and venue and grants Ronnoco's motion for temporary restraining order.

---

[1] On February 17, 2021, the Court denied Ronnoco's motion to strike and/or disallow as untimely Defendants' reply in support of their motion to dismiss Ronnoco's complaint for lack of jurisdiction. (Doc. No. 23). Because Defendants raised new issues in their reply concerning the corporate structure of Ronnoco and Trident, the Court permitted Ronnoco to file a surreply. (<u>Id</u>.). The Court is now in receipt of Ronnoco's surreply. (Doc. No. 24).

1

## I.      Background

The facts, summarized herein, are set forth in Ronnoco's complaint. Ronnoco has sold and distributed coffee and other products in the United States for over 100 years. (Complaint ("Compl."), Doc No. 1 at ¶ 37). Over the years, it has expanded geographically and expanded its product offerings beyond coffee. (Id.). In early 2020, Ronnoco acquired a majority ownership interest in Trident Marketing, Inc. and Trident Beverage, Inc. ("Trident"). (Id. at ¶ 38). Today, Ronnoco and Trident are in a parent/subsidiary relationship. (Id.). Ronnoco/Trident markets a line of 100% fruit juice beverage concentrates dispensed under the name "Juice Alive." (Id. at ¶ 39).

Defendant Castagna was employed by Ronnoco as a Territory Manager in the greater Dallas/Ft. Worth, Texas area from March 17, 2020 to July 23, 2020. (Id. at ¶¶ 5, 41, 45). Defendant Torres was employed as a Territory Manager in the greater Los Angeles, California area from March 17, 2020 to July 16, 2020. (Id. at ¶¶ 6, 42, 46). Before that, both Defendants were employed by Trident for over three years. (Id. at ¶ 7).

In their positions as Territory Managers, Defendants had access to confidential, proprietary, and trade secret information pertaining to Ronnoco/Trident's customers and products. (Id. at ¶¶ 17, 47). Because of their direct involvement in the expansion of Ronnoco/Trident's sales within their territories, Defendants participated in the creation of Ronnoco/Trident's trade secrets involving those customers within their territories. (Id.). For this reason, Ronnoco required as a condition of their employment that Defendants execute a Fair Competition Agreement (the "Agreement"). (Id. at ¶¶ 9, 10, 47-49; Doc. Nos. 1-3, -4).

2

The Agreement expressly prohibits Defendants from working with a competitor of Ronnoco both during their employment and for two years after employment with Ronnoco:

> [d]uring my employment and for two (2) years thereafter, and within two hundred (200) miles of any of my work locations for the Company, I will not, directly or indirectly, for myself or on behalf of or in connection with any other person, entity or organization: (a) engage in any business or activity that is competitive with the business of the Company; (b) ... assist or be connected with (including, but not limited to, as an employee, consultant, or otherwise) any business that directly or indirectly competes or is seeking to compete with the business of the Company; and/or (c) undertake any efforts or activities toward commencing any business or activity that could be competitive with the business of the Company.

(Doc. No. 1-3, -4 at ¶ 2). The Agreement further prohibits Defendants from soliciting Ronnoco's employees, clients, or customers:

> During my employment and for two (2) years thereafter, I will not, directly or indirectly, for myself or on behalf of or in connection with any other person, entity or organization: (a) induce or attempt to induce any employee or consultant of the Company to leave the employ or services of the Company or in any way interfere with the relationship between the Company and any employee or consultant thereof; and/or (b) call on, solicit, have contact with, or service any client of the Company with whom I have had material contact, in order to (i) solicit business of the type provided by the Company, (ii) to induce or attempt to induce such person or entity to cease doing business with, or reduce the amount of business conducted with, the Company, or (iii) in any way to interfere with the relationship between any such person or entity and the Company.

(Id. at ¶ 3). The Agreement also prohibits Defendants from disclosing Ronnoco's confidential and proprietary information:

> I will keep confidential and not disclose or use, either during or after my employment, any Confidential Information of the Company, except as required in good faith in performing my employment duties for the Company or as authorized by the Chief Executive Officer of the Company in a signed writing addressed specifically to me. "Confidential Information" means any information that is used, developed, obtained or received by the Company in connection with the Company's customer or supplier relationships and its other trade secrets, including but not limited to the following: (a) client and prospective client information, including client lists, compilations of client data, client preferences, and personal and/or financial information relating to clients; (b) business

3

information, including contractual arrangements, business plans, strategies, tactics, policies, procedures, resolutions, litigation or negotiations; ( c) marketing information, including sales or product plans, strategies, tactics, methods, or market research data; (d) financial information, including costs and performance data, pricing information, sales figures, profit or loss figures, debt arrangements, equity structure, investors and holdings; (e) personnel information, including personnel lists, resumes, personnel data, organizational structure and performance evaluations; and (f) product or service information, such as drawings, schematics, sketches, models, software, hardware, computer systems, source codes, suppliers, materials, equipment, research and development data, testing data, and other similar records. If ordered by a court of competent jurisdiction to disclose Confidential Information, I will provide written notice to the Company of such order immediately and cooperate in its efforts to safeguard such information. For the avoidance of doubt, Confidential Information does not include information in the public domain.

(Id. at ¶ 4). Defendants agreed to abide by these provisions when they signed the Agreement on March 17, 2020. (Compl. at ¶¶ 48, 49).

On July 16, 2020, Torres left his employment with Ronnoco. (Id. at ¶ 19). Castagna left his employment with Ronnoco on July 23, 2020. (Id. at ¶ 20). Thereafter, Ronnoco learned that both Defendants had accepted employment with one of its direct competitors, Smart Beverage, d/b/a Thirsty Coconut ("Smart Beverage"). (Id. at ¶¶ 21, 22, 60). Smart Beverage is in the same industry and competes directly with Ronnoco/Trident in frozen fruit juice beverages. (Id. at ¶ 61). In addition to their work for a direct competitor of Ronnoco, Defendants have been in contact with Ronnoco's customers and intend to divert those customers to Smart Beverage in direct violation of the Agreement. (Id. at ¶ 26, 62).

For example, on July 2, 2020, while still working for Ronnoco, Torres received an email on his personal email account from Smart Beverage employee Charles Peoples[2] attaching a "list

_____

[2] Peoples is the defendant in another lawsuit filed in this Court by Ronnoco against a former employee who went to work for Smart Beverage. See Ronnoco Coffee LLC v. Charles Peoples, Case No. 4:20CV1401-RLW (E.D. Mo.) (the "Peoples lawsuit").

of potential clients nationally for our new Choice Partners Co-op relationship. You will have to scroll through the list to identify accounts in your respective territories. I did see members in each of your areas." The list of Choice Partners Co-op members includes several Ronnoco clients, which the email states are "potential" clients of Smart Beverage. (Id. at ¶¶ 64-67; Doc. No. 1-5). On July 29, 2020, just six days after leaving Ronnoco's employ, Castagna emailed Peoples asking "[d]o we have any brochures or documents I can send the districts other than the flavors? I have one that is having a meeting on Monday and would like something to present to the principals." (Id. at ¶ 68; Doc. No. 1-6). Ronnoco alleges on information and belief that the "districts" are school districts in Texas and include school districts that are Ronnoco's customers. (Id. at ¶ 69). In addition, in August 2020, both Defendants were invited to a "Barfresh/Smart Beverage Weekly Sales Call. (Id. at ¶¶ 70-73; Doc. No. 1-7).

Ronnoco sent cease and desist letters to Defendants and Smart Beverage but received no response. (Id. at ¶ 77).

## II.    Defendants' motion to dismiss for lack of jurisdiction and venue

Ronnoco alleges the Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332(a), as Ronnoco is a citizen of Missouri, Torres is a citizen of California, and Castagna is a citizen of Texas; and the amount in controversy exceeds the sum of $75,000, as "Defendants have caused or, if not enjoined, will cause Ronnoco to suffer lost profits in excess of $75,000." (Compl. at ¶¶ 29-31). Ronnoco further alleges the Court has specific personal jurisdiction over Defendants under R.S. Mo. § 506.500.1(1), (2), because Defendants entered into the Agreement with Ronnoco, a Missouri limited liability company; agreed to jurisdiction in the Court; was employed by Ronnoco; and thereby transacted business in Missouri. (Id. at ¶¶ 33-

34). Lastly, Ronnoco alleges venue is proper in this District because the events giving rise to the claims herein occurred in substantial part in this District, where Defendants accepted the Agreements and transacted busines, and threatened harm has occurred and will continue to occur in this District if Defendants are not enjoined. (Id. at ¶ 35).

### A.     Diversity of citizenship

In support of their motion to dismiss, Defendants first argue that Ronnoco's complaint is procedurally defective because it does not contain allegations of jurisdictional facts regarding the states of Defendants' citizenship. The Complaint alleges that Castagna is a "resident of Texas" (Compl. at ¶ 3) and Torres is a "resident of California" (id. at ¶ 4). Defendants are correct that an allegation of residence is not the equivalent of an allegation of citizenship. Nevertheless, the place of residence is prima facie the domicile, see Randall v. Evamor, Inc., No. 4:09CV01756 ERW, 2010 WL 1727977, at *2 (E.D. Mo. Apr. 29, 2010), and for purposes of diversity jurisdiction, "citizenship" and "domicile" are synonymous, Bakhtiari v. Phillips, No. 4:09-CV-1382 CAS, 2009 WL 3711979, at *1 n.1 (E.D. Mo. Nov. 5, 2009). Moreover, Ronnoco has specifically alleged that "[f]or diversity jurisdiction purposes, Ronnoco is a citizen of Missouri and Delaware; Castagna is a citizen of Texas; and Torres is a citizen of California." (Compl. at ¶ 30). Therefore, Defendants' motion to dismiss will be denied on this ground.

### B.     Amount in controversy

Next, Defendants argue the complaint must be dismissed because Ronnoco has not alleged sufficient facts to establish an amount in controversy in excess of $75,000. In support of their contention, Defendants submit a declaration from Luke Einsel, President of Smart Beverage, stating that since July 2020, Smart Beverage has realized $4,200.00 in sales in the

state of California, and $12,877.40 in sales in the northern portion of the state of Texas. (Doc. No. 13-1 at ¶ 14). Moreover, Einsel asserts that the contracts awarded to Smart Beverage in 2020, about which Ronnoco complains, were returned to Ronnoco after Smart Beverage corrected an error in its application which was brought to its attention by Ronnoco. According to Einsel, the "profits" Ronnoco allegedly lost out on due to that contract temporarily being awarded to Smart Beverage was no more than $2,000.00. (Id. at ¶¶ 13, 14).

Generally speaking, a complaint that alleges the jurisdictional amount in good faith will be sufficient to confer jurisdiction; however, the complaint will be dismissed if it appears to a legal certainty that the claim is really for less than the jurisdictional amount. See Scottsdale Ins. Co. v. Universal Crop Prot. All., LLC, 620 F.3d 926, 931 (8th Cir. 2010). If the defendant challenges the plaintiff's allegations of the amount in controversy, then the plaintiff has an obligation to show, by a preponderance of the evidence, facts supporting jurisdiction. Schubert v. Auto Owners Ins. Co., 649 F.3d 817, 822 (8th Cir. 2011) (citing McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936)). The jurisdictional fact in a diversity case is not whether the damages are greater than the requisite amount, but whether a fact finder might legally conclude that they are. Kopp v. Kopp, 280 F.3d 883, 885 (8th Cir. 2002).

Ronnoco submits a declaration from John Walker, President of Trident Marketing, Inc. and Trident Beverage, Inc. (Doc. No. 17-1), indicating that Ronnoco/Trident's gross profit in 2019 was over $800,000 in Torres' territory and over $350,000 in Castagna's territory. (Id. at ¶ 11). Walker states that in their respective territories, Defendants called on, serviced, and were solely responsible for each of Ronnoco/Trident's customers, and that if not enjoined, will solicit each and every customer they previously serviced for Ronnoco/Trident, threatening

Ronnoco/Trident with the loss of $800,000 annual profit in Torres' territory and over $350,000 annual profit in Castagna's territory.

In reply, Defendants argue that Ronnoco is conflating the two organizations (Ronnoco and Trident) to argue that the amount in controversy requirement has been met. Relying on Walker's February 8, 2021 trial testimony in the Peoples lawsuit regarding Ronocco's corporate structure, Defendants argue that Trident is a separate and distinct subsidiary of Ronnoco, and as such, Trident's 2019 revenue numbers have no bearing on Ronocco's 2020 contracts or sales performance.[3] In its surreply, Ronnoco relies upon Judge White's findings of fact in the Peoples lawsuit regarding the Ronnoco/Trident transaction and current corporate relationship, and specifically that Ronnoco acquired an 80% ownership interest in Trident Holdings, which in turn owns all of Trident and all of its assets. (Case No. 4:20CV140, Doc. No. 97 at 2).

In the Peoples lawsuit, Judge White rejected the argument that Ronnoco has no claim to Trident's profits and found that as majority owner of Trident Holdings, Ronnoco is entitled to 80% of the profits generated on contracts to which Trident Holdings is a party. (Id. at 11-12). As Ronnoco correctly points out, past profits can be used to estimate lost future profits for purposes of determining the amount in controversy. See, e.g., United Seating & Mobility, LLC. v. Homen, 4:05CV2208 JCH, 2006 WL 473739, at *2 (E.D. Mo. Feb. 28, 2006) ("As Defendant generated revenues exceeding $300,000 during a five-month period while in the employ of Plaintiff, a jury easily could find that the value of enjoining her from competing with Plaintiff and/or soliciting its clients for a period of one year exceeds $75,000."). Further, in actions seeking injunctive

---

[3] Defendants have submitted transcripts of portions of Walker's testimony in the Peoples lawsuit from a January 11, 2021 contempt hearing and at the February 8, 2021 trial on the merits and asked the Court to take judicial notice of the same. (Doc. Nos. 25, 25-1, 25-2). Because certified copies of these transcripts

relief, "it is well established that the amount in controversy is measured by the value of the object of the litigation." James Neff Kramper Family Farm P'ship v. IBP, Inc., 393 F.3d 828, 833 (8th Cir. 2005) (quoting Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 347 (1977)). Here, the object of the litigation is Ronnoco's alleged entitlement to "80% of profits generated on contracts to which Trident Holdings is a party" free from Defendants' competition for a two-year period.

Based upon a review of the present record and Ronocco's complaint, it seems clear that a fact finder might legally conclude that Ronocco's damages are greater than the requisite jurisdictional amount. Because there is no indication that it appears to a "legal certainty that the claim is really for less than the jurisdictional amount," Defendants' motion to dismiss will be denied on this ground.

## C.    Choice of law and venue

The Agreements at issue here specify that Missouri law applies and further provides for jurisdiction and venue in this forum:

> Missouri law will govern both this Agreement and the terms and conditions of my employment. Venue for any legal proceeding or action at law arising out of or construing this Agreement, or relating to my employment, shall lie in the appropriate state or federal courts having jurisdiction over St. Louis County, Missouri.

(Doc. Nos. 1-3, -4 at ¶ 11). Citing § 187(2), Restatement (Second) of Conflict of Laws, Defendants argue they must both be dismissed from this action because they live and work outside of Missouri, entered into contracts outside of Missouri, and because their home states of Texas and California have a materially greater interest in protecting the rights of its residents and

---

are part of the record in the Peoples lawsuit, the Court will take judicial notice, under Rule 201(b)(2), of those transcripts.

of regulating the commerce which takes place within it. Torres specifically argues that he must be dismissed because California Labor Code § 925 voids any provision of a contract that sets venue and choice of law outside of California.

It is well settled that a federal court sitting in diversity must apply the choice-of-law rules of the state in which the action was originally filed. ISG Tech., Inc. v. Secure Data Techs., Inc., No. 20-CV-03345-SRB, 2020 WL 7389746, at *4 (W.D. Mo. Dec. 16, 2020) (citing Interstate Cleaning Corp. v. Commercial Underwriters Ins. Co., 325 F. 3d 1024, 1028 (8th Cir. 2003)). Thus, this Court applies Missouri's choice-of-law rules. Generally, Missouri courts apply the Restatement (Second) of Conflicts in contract actions. See Educational Employees Credit Union v. Mut. Guar. Corp., 50 F.3d 1432, 1437 (8th Cir. 1995). When a contract contains a choice of law provision, the validity of that provision is governed by the Restatement § 187.[4]

The first step of any § 187 analysis is to determine whether the issue for determination is one which the parties "could have resolved by an explicit provision in their agreement directed to that issue." Restatement § 187(1). If so, then the Court should follow the law of the state chosen

---

[4] Section 187, Restatement (Second) of Conflict of Laws, provides:

(1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

by the parties to determine the contractual rights and duties at issue. <u>Saey v. Xerox Corp.</u>, 31 F. Supp. 2d 692, 696 (E.D. Mo. 1998). Here, the parties explicitly agreed on the terms of the non-compete and confidentiality obligations and the choice of Missouri law to govern those obligations. Accordingly, the Court will follow Missouri law. <u>See</u> <u>Davidson & Assocs., Inc. v. Internet Gateway, Inc.</u>, 334 F. Supp. 2d 1164, 1176 (E.D. Mo. 2004) (citing <u>Hospital Products, Inc. v. Sterile Design, Inc.</u>, 734 F. Supp. 896, 899 n. 2 (E.D. Mo. 1990) (court applies Missouri law where parties agreed that Missouri law would govern interpretation of the agreement).

Missouri courts recognize that parties may choose the state whose law will govern the interpretation of their contractual rights and duties, <u>ISG Tech.</u>, 2020 WL 7389746, at *4 (citing <u>State ex rel. McKeage v. Cordonnier</u>, 357 S.W.3d 597, 600 (Mo. banc 2012) (noting "[a] valid choice of law provision in a contract binds the parties"), and will enforce choice of law provisions in noncompete agreements so long as they do not violate a fundamental policy of Missouri law, <u>Consol. Fin. Investments, Inc. v. Manion</u>, 948 S.W.2d 222, 224 (Mo. Ct. App. 1997). <u>See also</u> <u>PVI, Inc. v. Ratiopharm GmbH</u>, 253 F.3d 320, 326 (8th Cir. 2001) (citation omitted). The public policy of Missouri encourages the enforcement of covenants not to compete. <u>Emerson Elec. Co. v. Rogers</u>, 418 F.3d 841, 847 (8th Cir. 2005) (citing <u>Natl. Starch & Chem. Corp. v. Newman</u>, 577 S.W.2d 99, 104 (Mo. Ct. App. 1978) ("The policy of Missouri is to enforce reasonable restrictive covenants which tend to protect Missouri businesses from unfair competition by former employees.").

Defendants' assertion that conflict of law principles dictate that the Court should apply California and Texas law in this case is without merit. Each state has a substantial interest in the validity of the covenant; however, there is no indication that Missouri lacks all interest in the

11

transaction or that California or Texas's interest in the dispute is materially greater than that of Missouri. Restatement § 187. See Emerson Elec., 418 F.3d at 847. As for Torres' argument that California Labor Code § 925 voids the Agreement's provision for jurisdiction and venue in this forum, the Court notes that district courts outside of California considering choice of law provisions and forum selection clauses have refused to apply § 925 when another state's law has been chosen by the parties. See, e.g., Howmedica Osteonics Corp. v. Howard, No. CV1919254SDWLDW, 2020 WL 1102494, at *4 (D.N.J. Jan. 17, 2020), report and recommendation adopted, No. 19-19254 (SDW) (LDW), 2020 WL 1082601 (D.N.J. Mar. 5, 2020); Genesys Telecommunications Labs., Inc. v. Morales, No. 119CV00695TWPDML, 2019 WL 5722225, at *7 (S.D. Ind. Nov. 5, 2019); Cherry Creek Mortg. Co. v. Jarboe, No. 18-CV-00462-KLM, 2018 WL 6249887, at *4 (D. Colo. Nov. 29, 2018). Because Missouri law applies and because this Court is the proper forum, Defendants' motion to dismiss will be denied on this ground.

## III.   Ronocco's motion for temporary restraining order

### A.   Legal standard

In determining whether to issue a temporary restraining order, the Court must consider four factors: (1) the likelihood the moving party will succeed on the merits, (2) the threat of irreparable harm to the moving party; (3) the balance between this harm and the injury that granting the injunction will inflict on other parties; and (4) the public interest. Kroupa v. Nielsen, 731 F.3d 813, 818 (8th Cir. 2013); see also Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc)). The inquiry is "whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are

determined." <u>Dataphase</u>, 640 F.2d at 113. The likelihood of success is the most important factor. <u>Roudachevski v. All-Am. Care Centers, Inc.</u>, 648 F.3d 701, 706 (8th Cir. 2011). This factor directs courts to ask whether the party requesting a preliminary injunction has a "fair chance of prevailing." <u>Planned Parenthood Minn., N. Dak., S. Dak. v. Rounds</u>, 530 F.3d 724, 732 (8th Cir. 2008) (en banc). A court does not decide whether the movant will "ultimately win." <u>Glenwood Bridge, Inc. v. City of Minneapolis</u>, 940 F.2d 367, 371 (8th Cir. 1991).  Instead, a court considers whether the movant's position is fairly supported by governing law. <u>Id.</u>

Even when a plaintiff has a strong claim on the merits, however, "[f]ailure to demonstrate irreparable harm is a sufficient ground to deny a preliminary injunction." <u>Phyllis Schlafly Rev. Trust v. Cori</u>, 924 F.3d 1004, 1009 (8th Cir. 2019) (quoted case omitted). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." <u>Gen. Motors Corp. v. Harry Brown's, LLC</u>, 563 F.3d 312, 319 (8th Cir. 2009). The moving party bears the burden to establish the need for a preliminary injunction. <u>Chlorine Institute, Inc. v. Soo Line R. R.</u>, 792 F.3d 903, 914 (8th Cir. 2015).

**B.    Discussion**

**(1)    Likelihood of success on the merits**

Missouri courts will enforce a non-competition agreement in limited circumstances that are "demonstratively reasonable." <u>Whelan Sec. Co. v. Kennebrew</u>, 379 S.W.3d 835, 841 (Mo. 2012) (en banc). "A non-compete agreement is reasonable if it is no more restrictive than is necessary to protect the legitimate interests of the employer." <u>Id</u>. at 842 (quoted case omitted). The agreement must be narrowly tailored in terms of time and geography and must protect

legitimate employer interests "beyond mere competition by a former employee." Id. at 841-82. Further under Missouri law, "a non-compete agreement is enforceable 'only to the extent that the restrictions protect the employer's trade secrets or customer contacts.'" Id. at 842 (quoting Healthcare Servs. of the Ozarks, Inc. v. Copeland, 198 S.W.3d 604, 610 (Mo. 2006) (en banc)). "The employer has the burden to prove that the non-compete agreement protects its legitimate interests in trade secrets or customer contacts and that the agreement is reasonable as to time and geographic space." Id. Here, Ronnoco must show the Agreement is reasonable for it to be enforced against Defendants, and that its terms are not more restrictive than necessary to protect its legitimate interests. Id.

Based on the record presented to this Court, the Court finds Ronnoco has met its burden of establishing that preliminary relief is warranted. First, the Court finds that Ronnoco has shown a substantial likelihood of prevailing on the merits. Defendants knowingly executed the Agreement. The evidence presented in Ronnoco's Verified Complaint, the Declaration of Trident's President, and the exhibits show that Defendants had access to confidential or proprietary information in their positions with Ronnoco/Trident, including its customer base and pricing and bidding information and strategies. Defendants developed relationships with Ronnoco/Trident customers and have the knowledge and influence to solicit them for their new employer, Smart Beverage, a direct Ronnoco/Trident competitor. There is evidence Defendants have violated and are actively violating the Agreement by which they have agreed to be bound, by working for Smart Beverage within 200 miles of their territories with Ronnoco; by remaining in contact with Ronnoco's customers with the intent to divert those customers to Smart

Beverage; and, on information and belief, by sharing Ronnoco's confidential and proprietary information with Smart Beverage and using that information on Smart Beverage's behalf.

### a.     The Agreement is enforceable

As a threshold matter, the Court finds there is adequate consideration for the Agreement, executed as a condition of Defendants' acceptance of Ronnoco/Trident's offer of employment in March 2020. Defendants' continued employment with Trident and new employment with Ronnoco, which gave them access to Ronnoco/Trident's new and existing customers, as well as continued at-will employment, salary, and commissions, constitutes adequate consideration. See JumboSack Corp. v. Buyck, 407 S.W.3d 51, 56-57 (Mo. Ct. App. 2013) ("Missouri courts have recognized that continued at-will employment constitutes consideration for a non-compete agreement where the employer allows the employee 'by virtue of the employment[,] to have continued access to [its] protectable assets and relationships.'") (citing cases). See also Allstate Ins. Co. v. Head, No. 2:17CV04169-NKL, 2018 WL 6050881, at *6 (W.D. Mo. Nov. 19, 2018) (non-compete agreement supported by consideration where defendant insurance agent "'received in consideration … access to [Allstate's] new and existing customers' and other confidential information that, parties agreed, constitute protectable assets.").

The Agreement protects interests that Missouri recognizes as legitimate and protectable as a matter of law, including Ronnoco's confidential business information, customer contacts, and goodwill, as well as its interest in preventing Defendants from unfairly using those assets to compete with Ronnoco, diverting away its customers, and obtaining an undue advantage for their new employer's competing business. See, e.g., Safety-Kleen Sys., Inc. v. Hennkens, 301 F.3d 931, 937 (8th Cir. 2002) ("Missouri courts have frequently held that … substantial and

15

individualized customer contacts are a protectable interest warranting injunctive relief enforcing a covenant not to compete."); Kessler-Heasley Artificial Limb Co., Inc. v. Kenney, 90 S.W.3d 181, 186 (Mo. Ct. App. 2002). Ronnoco also has a legitimate interest in protecting its client information and client relationships from use by a competitor. See Mid-States Paint & Chem. Co. v. Herr, 746 S.W.2d 613, 617 (Mo. Ct. App. 1988) ("The employer has protectable interests in trade secrets and customer contacts.").

Defendants argue the Agreement cannot be enforced because Ronocco's business is in the commercial and retail coffee industry and Smart Beverage does not sell coffee and does not compete with Ronnoco in the sale of coffee. The Court agrees with Judge White's analysis in rejecting this argument in the Peoples lawsuit, finding that:

> when Ronnoco acquired an 80% ownership interest in Trident Holdings, it became "engaged" in the same business or activity in which Trident Beverage, Inc. and Trident Marketing, Inc. had previously been engaged to date: the selling of fruit juice beverages to schools. By virtue of the acquisition, "the business of Ronnoco" now includes selling juice beverages to schools. Ronnoco is the majority owner of Trident Holdings' confidential information and trade secrets, and it is legitimate for Ronnoco to seek to restrain its employees … from using that information after their employment ends. Ronnoco is entitled to 80% of profits generated on contracts to which Trident Holdings is a party and it is legitimate for Ronnoco to seek to restrain employees … from causing those profits to be lost through unfair competition.

(Doc. No. 97 at 11-12).

Defendants further argue that the information at issue, i.e., Ronnoco/Trident's pricing information and customer lists, is publicly available and thus not proprietary. However, as detailed in Walker's Declaration, the pricing in any party's bids is not public until after the bid was decided by the customer. (Doc. No. 17-1 at ¶ 5). Before the bids are awarded, Ronnoco/Trident does not know the pricing that Smart Beverage submits on any bid, yet Smart

16

Beverage has access to Trident's pricing because of Defendants. Further, not all Ronnoco/Trident's customers are part of such a bid process; some are private non-school entities. (Id. at ¶ 6).

Under Missouri law, "an employer has a proprietary right in his stock of customers and their good will." Emerson Elec., 418 F.3d at 845 (citation omitted). "Customer contacts may be protected under a restrictive covenant since sales personnel may 'exert a special influence over [a] customer.'" Id. (quoting Walter E. Zemitzsch, Inc. v. Harrison, 712 S.W.2d 418, 422 (Mo. Ct. App. 1986). Indeed, "[a]n express agreement not to compete may be enforced as to employees having substantial customer contacts. It is not necessary to show that there is a secret customer list." Id. (quoting Osage Glass. Inc. v. Donovan, 693 S.W.2d 71, 75 (Mo. 1985) (en banc)).

The Court is also not persuaded by Defendants' largely unsupported arguments that Ronnoco cannot enforce the Agreement because they performed minimal work for it during their brief periods of employment, which corresponded with nationwide business shutdowns as a result of the COVID-19 pandemic. This argument ignores the facts that Defendants worked for Trident for three years under an agreement protecting confidential information and business relationships. During their employment with Trident, Defendants acquired its confidential and business relationship information including but not limited to customer contacts, pricing, and contract bidding strategies. Ronnoco/Trident as Defendants' subsequent employer has a legitimate interest in restraining them from using knowledge they gained while working for Trident as well as Ronnoco to unfairly compete against it. Cf. Emerson Elec., 418 F.3d at 845 (non-compete agreement was enforceable against manufacturers' representative with respect to

17

customers the representative had before he started working with Emerson and those who had never purchased Emerson's products).

In addition, the Agreement is adequately restricted in both time and geographic reach. The noncompetition, nonsolicitation, and nondisclosure provisions are limited to two years from the execution of the Agreement, subject to tolling, which is reasonable. See Church Mut. Ins. Co. v. Sands, No. 14-CV-3119-S-DGK, 2014 WL 3385208, at *3-4 (W.D. Mo. July 9, 2014) (holding a three-year non-compete agreement enforceable; citing House of Tools & Eng'g, Inc. v. Price, 504 S.W.2d 157, 159 (Mo. Ct. App. 1973) (enforcing three-year non-compete agreement where employee salesperson was given extensive information on the employer's customers)); Alltype Fire Prot. Co. v. Mayfield, 88 S.W.3d 120, 123 (Mo. Ct. App. 2002) (finding a two-year limitation on employment reasonable). The geographic area of the noncompetition provision is limited to a 200-mile radius from any of Defendants' work locations for Ronnoco. This is reasonable as it serves to protect Ronnoco against Defendants' use of confidential information in the places that would damage Ronnoco the most. See Mid–States Paint, 746 S.W.2d at 617 (finding a salesperson's former sales territory constitutes an acceptable geographic restriction).

### b.    Defendants breached the Agreement

The Agreement is currently in effect. The evidence presented establishes that Defendants began working for direct competitor Smart Beverage, within 200 miles of their former work locations for Ronnoco, immediately upon leaving Ronnoco/Trident's employ; and diverted or attempted to divert Ronnoco's customers to Smart Beverage. Moreover, Torres was communicating with Smart Beverage regarding Ronnoco/Trident's customers while still

18

employed by Ronnoco/Trident. These facts indicate that Ronnoco is likely to succeed on the merits of its breach of contract claim against Defendants.

The Court also finds Ronnoco is likely to succeed on the merits of its trade secret claim. To establish a violation of the Missouri Uniform Trade Secrets Act ("MUTSA"), Mo. Rev. Stat. § 417.450, et seq., a plaintiff must demonstrate "(1) the existence of a protectable trade secret, (2) misappropriation of those trade secrets by Defendants, and (3) damages." Secure Energy Inc. v. Coal Synthetics, LLC, 708 F. Supp.2d 923, 926 (E.D. Mo. 2010). Missouri law defines a trade secret as:

> information, including but not limited to, technical or nontechnical data, a formula, pattern, compilation, program, device, method, technique, or process, that: (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Mo. Rev. Stat. § 417.453(4) (2010). Misappropriation is defined as a person's use of a trade secret of another:

> without express or implied consent if that person: (a) used improper means to acquire knowledge of the trade secret; (b) knew or had reason to know that it was a trade secret and that knowledge had been acquired by accident or mistake; or (c) at the time of the use, knew or had reason to know that knowledge of the trade secret was (1) derived from or through a person who had utilized improper means to acquire it, (2) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or (3) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

Secure Energy, 708 F. Supp.2d at 926 (citing Mo. Rev. Stat. § 417.453(2)(b)).

Based on the current record, the Court finds that during their employment with Ronnoco/Trident, Defendants were privy to and worked extensively with Ronnoco/Trident's trade secrets regarding such matters as names of and specific contacts at Ronnoco/Trident's

19

customers and potential customers; contracts between Ronnoco/Trident and its customers, along with the terms of those contracts, and confidential business information such as pricing and contract bid strategy. Defendants knew this information was Ronnoco/Trident's trade secrets, and they acquired it under circumstances giving rise to a duty to maintain its secrecy. If Defendants were permitted to work at Smart Beverage, their use and disclosure of Ronnoco/Trident's trade secrets appears inevitable because their responsibilities at Smart Beverage are similar to those they held for Ronnoco/Trident and they are likely to be in situations where their knowledge of Ronnoco/Trident's confidential information would help Smart Beverage in competing against Ronnoco/Trident. Furthermore, Torres's email communication with Peoples while still working for Ronnoco listing several Ronnoco clients as "potential" clients of Smart Beverage demonstrate an unwillingness to honor the terms of the Agreement and preserve confidentiality. See Express Scripts, Inc. v. Lavin, No. 17CV01423 HEA, 2017 WL 2903205, at *7 (E.D. Mo. July 7, 2017): H&R Block Eastern Tax Services, Inc. v. Enchura, 122 F. Supp. 2d 1067, 1074-75 (W.D. Mo. 2000). Such threatened misappropriations also can be enjoined. Mo. Rev. Stat § 417.455.1. Thus, the Court finds that Ronnoco has a reasonable likelihood of success on the merits of its MUTSA trade secrets claim.[5]

**(2)    Irreparable Harm**

Ronnoco has sufficiently shown it will suffer irreparable harm if temporary injunctive relief is not granted. Irreparable harm is established if monetary remedies cannot provide adequate compensation for improper conduct. Rogers Grp., Inc. v. City of Fayetteville, Ark., 629

---

[5] Ronnoco's breach of duty of loyalty claim against Torres (Count II) may be subsumed at least in part within its MUTSA claim. See Custom Hardware Eng'g & Consulting, Inc. v. Dowell, 918 F.Supp.2d 916, 936 (E.D. Mo. 2013) ("By virtue of [MUTSA], civil claims that are derivative of a claim of misappropriation of trade secrets are preempted. Claims based on facts related to the misappropriation

F.3d 784, 789 (8th Cir. 2010). The Court finds there is a threat of irreparable harm to Ronnoco/Trident if Defendants are not restrained from using confidential trade secret information and influence they acquired during their tenure with Ronnoco/Trident. Loss of consumer goodwill can constitute irreparable harm. Gen. Motors, 563 F.3d at 319. The threat of unrecoverable economic loss and customers qualifies as irreparable harm. Iowa Utilities Bd. v. F.C.C., 109 F.3d 418, 426 (8th Cir. 1996) (quoted case omitted). "Courts generally hold that the disclosure of confidential information such as business strategy will result in irreparable harm to the plaintiff[.]" Panera, LLC v. Nettles, 2016 WL 4124114, at *4 (E.D. Mo. Aug. 3, 2016) (citing cases).

Courts have also presumed irreparable injury from a breach of a covenant not to compete or solicit, or of a confidentiality agreement. See, e.g., H&R Block Tax Servs. LLC v. Haworth, 2015 WL 5601940, at *4 (W.D. Mo. Sept. 22, 2015) ("Irreparable harm also properly is presumed where, as here, there is evidence that a covenant not to compete is breached or confidential, proprietary information is being improperly used."); see also Panera, 2016 WL 4124114, at *4 ("Courts regularly find irreparable harm where a non-compete agreement states that its breach constitutes irreparable injury.").

 In this case, the irreparable harm to Ronnoco may include not only the disclosure of confidential information and trade secrets, potentially resulting in unrecoverable economic losses and loss of customers, but also the violation of a binding non-competition agreement designed to protect Ronnoco's interests. Here, Defendants agreed that "(a) the breach of any provision of this Agreement will result in immediate and irreparable harm to the Company[.]" (Doc. Nos. 1-3, 1-4

---

claim are derivative, and therefore preempted.") (cited case omitted).

at ¶ 8). As such, its remedy at law is inadequate because its damage would be difficult if not impossible to measure. See Baker Electric Co-op., Inc. v. Chaske, 28 F.3d 1466, 1473 (8th Cir. 1994); Systematic Bus. Servs., Inc. v. Bratten, 162 S.W.3d 41, 51 (Mo. Ct. App. 2005). In addition, Defendants agreed that in the event of a breach of the Agreement, Ronnoco would be entitled to equitable relief, as monetary damages would not fully compensate it for its injuries. (Doc. Nos. 1-3, 1-4 at ¶ 8).

If the Court does not intervene to enjoin Defendants' conduct, Ronnoco will continue to sustain irreparable damage in the form of lost customers, business, and goodwill. Defendants' employer Smart Beverage is directly competing against Ronnoco for its customers and contracts, in the same Texas region where Castagna worked for Ronnoco/Trident and in the same California region where Torres worked for Ronnoco/Trident. Based on the authority cited and the evidence presented, this factor favors entry of a temporary restraining order.

**(3)   Balance of Harms**

Next, the balance between the harm and the injury that granting the temporary restraining order will inflict favors granting the requested relief. The Court is persuaded that Defendants possess information that could be used for the purpose of causing irreparable harm to Ronnoco/Trident in the form of lost customers, contracts, and a diminished competitive position. The injury to Ronnoco's relationships with its customers and injury to its business outweighs any potential harm that the proposed relief may cause Defendants. Defendants signed the Agreement, which acknowledges that "injunctive relief will not deprive [them] of an ability to earn a living because [they] [are] qualified for many positions which do not involve competing with [Ronnoco] or otherwise necessitate the breach of any provision of this Agreement[.]" (Doc. Nos.

22

1-3, -4 at ¶ 8(d).) Defendants accepted significant financial and other benefits from their employment with Ronnoco/Trident, and they should not now be relieved of their own obligations. See Emerson Elec., 418 F.3d at 846. While Defendants will not be permitted to work for Smart Beverage, they are free to obtain other employment that calls for their sales skills in businesses that do not compete with Ronnoco/Trident. Any harm to Defendants is self-inflicted and the restraints being placed on them are no greater than those to which they already agreed. See, e.g., Sierra Club v. U.S. Army Corps of Eng'rs, 645 F.3d 978, 997 (8th Cir. 2011) (balance of harms weighed in plaintiff's favor where injury to defendant was "largely self inflicted"). Further, the harm to Defendants if they are enjoined until the Court holds a preliminary injunction hearing can be mitigated by the payment of any monies that may be lost during the period of non-employment. Thus, the harm that Ronnoco has suffered and will continue to suffer absent an injunction outweighs any harm that may befall Defendants if their actions are enjoined.

      **(4)**    **The Public Interest**

Finally, the public interest also favors Ronnoco. Missouri courts have found that the enforcement of reasonable restrictive covenants serves the public interest. See Schott v. Beussink, 950 S.W.2d 621, 625 (Mo. Ct. App. 1997) ("Missouri courts recognize that public policy approves employment contracts containing restrictive covenants because the employer has a proprietary right in its stock of customers and their good will, and if the covenant is otherwise reasonable, the court will protect the asset against appropriation by an employee."). "The public interest is also furthered by preserving the enforceability of contractual relationships." H&R Block Tax Servs., LLC v. Cardenas, No. 4:20-CV-00109-SRB, 2020 WL 1031033, at *4 (W.D.

23

Mo. Mar. 3, 2020). Conversely, denying injunctive relief would undermine the enforceability of contractual relationships and the Missouri Uniform Trade Secrets Act.

**Conclusion**

For these reasons, the Court finds the <u>Dataphase</u> factors have been met with respect to Ronnoco's request for a temporary restraining order against Defendants.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants Kevin Castagna and Jeremy Torres's Motion to Dismiss for Lack of Jurisdiction and Venue [13] is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff Ronnoco Coffee LLC's Motion for Temporary Restraining Order [7] is **GRANTED**. Defendants Kevin Castagna and Jeremy Torres and their agents, and all other persons who are in active concert with them, are hereby temporarily restrained until further Order of this Court from directly or indirectly:

(1) With respect to confidential and proprietary information, including trade secrets, of Ronnoco/Trident, from disclosing, using, or providing any such documents, information, or trade secrets, directly or indirectly, to anyone, except for the return of such documents, information, or trade secrets directly to Ronnoco or its attorneys;

(2) Acting, directly or indirectly (whether as an owner, employee, consultant, independent contractor or any other role) in any capacity with a company that directly competes with Ronnoco/Trident, including but not limited to Smart Beverage, d/b/a Thirsty Coconut; and

(3) Calling upon, soliciting, diverting, attempting to call upon, solicit, or divert (or assist in any of the foregoing), or accept business from/do business with any customer/potential customer of Ronnoco/Trident that was a customer/potential customer during Peoples' employment with Ronnoco/Trident.

**IT IS FINALLY ORDERED** that Ronnoco Coffee LLC shall post security in the amount of $10,000 with the Clerk of the Court, either in cash or through a Court-approved

surety.

      **IT IS FURTHER ORDERED** that this matter is set for a hearing by video-conference on Ronnoco Coffee LLC's motion for preliminary injunction on **Friday, March 19, 2021 at 1:30 p.m.**

      **IT IS FURTHER ORDERED** that a telephone conference with counsel is scheduled for **Wednesday, March 17, 2021 at 11:00 a.m**. Counsel are directed to call the conference toll free at **1-877-810-9415.** The access code to enter the telephone conference for all participants is: **7519116.**

      Dated this 5th day of March, 2021.


**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**