**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| RONNOCO COFFEE, LLC, d/b/a ) <br> RONNOCO BEVERAGE ) <br> SOLUTIONS, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> KEVIN CASTAGNA and ) <br> JEREMY TORRES, ) <br> ) <br> Defendants. ) | No. 4:21-CV-00071 JAR |

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER**

On January 19, 2021, Plaintiff Ronnoco Coffee, LLC, d/b/a Ronnoco Beverage Solutions ("Ronnoco") filed this action against Defendants Kevin Castagna ("Castagna") and Jeremy Torres ("Torres") (collectively "Defendants") to enforce non-competition and confidentiality agreements against each of them, to enjoin the threatened misappropriation of trade secrets, to enjoin interference with prospective business relationships, and to sue for breach of contract and breach of the duty of loyalty. (Doc. No. 1). On January 29, 2021, Ronnoco filed a Motion for Temporary Restraining Order ("TRO") and Preliminary Injunction. (Doc. No. 7). On February 2, 2021, Defendants filed a Motion to Dismiss for Lack of Jurisdiction and Venue. (Doc. No. 13). The Court heard oral argument on Ronnoco's motion for TRO via Zoom video conference on February 2, 2021. On March 5, 2021, the Court denied Defendants' motion to dismiss and granted Ronnoco's motion for TRO, ordering that:

> Defendants Kevin Castagna and Jeremy Torres and their agents, and all other persons who are in active concert with them, are hereby temporarily restrained until further Order of this Court from directly or indirectly:

1

    (1)  With  respect  to  confidential  and  proprietary  information,  including  trade
secrets,  of  Ronnoco/Trident,  from  disclosing,  using,  or  providing  any  such
documents,  information,  or  trade  secrets,  directly  or  indirectly,  to  anyone,  except
for  the  return  of  such  documents,  information,  or  trade  secrets  directly  to  Ronnoco
or  its  attorneys;

    (2)   Acting,  directly  or  indirectly  (whether  as  an  owner,  employee,  consultant,
independent  contractor  or  any  other  role)  in  any  capacity  with  a  company  that
directly  competes  with  Ronnoco/Trident,  including  but  not  limited  to  Smart
Beverage,  d/b/a  Thirsty  Coconut;  and

    (3)   Calling  upon,  soliciting,  diverting,  attempting  to  call  upon,  solicit,  or  divert
(or  assist  in  any  of  the  foregoing),  or  accept  business  from/do  business  with  any
customer/potential  customer  of  Ronnoco/Trident  that  was  a  customer/potential
customer  during  Defendants'  employment  with  Ronnoco/Trident.

(Doc. No. 26). The Court further ordered Ronnoco to post a bond in the amount of $10,000.00

and then set Ronnoco's motion for preliminary injunction for hearing via Zoom video conference

on March 19, 2021. (Id.).

On March 19, the Court found good cause to extend the TRO against Defendants for an

additional fourteen days. The parties were unable to agree to consolidate the preliminary

injunction hearing with trial on the merits, and the Court reset Ronnoco's motion for preliminary

injunction for hearing via Zoom video conference on April 1, 2021. (Doc. No. 36). Following the

April 1 hearing, the Court found good cause to continue the TRO in full force and effect pending

its written order. (Doc. No. 45). On April 20, 2021, the Court granted Ronnoco's motion and

preliminarily enjoined Defendants from directly or indirectly:

    (1) With  respect  to  confidential  and  proprietary  information,  including  trade
secrets,  of  Ronnoco/Trident,  from  disclosing,  using,  or  providing  any  such
documents,  information,  or  trade  secrets,  directly  or  indirectly,  to  anyone,
except  for  the  return  of  such  documents,  information,  or  trade  secrets  directly
to  Ronnoco  or  its  attorneys;

    (2) Acting,  directly  or  indirectly  (whether  as  an  owner,  employee,  consultant,
independent  contractor  or  any  other  role)  in  any  capacity  with  a  company  that

> directly competes with Ronnoco/Trident, including but not limited to Smart Beverage, d/b/a Thirsty Coconut; and
>
> (3)   Calling upon, soliciting, diverting, attempting to call upon, solicit, or divert (or assist in any of the foregoing), or accept business from/do business with any customer/potential customer of Ronnoco/Trident that was a customer/potential customer during Defendants' employment with Ronnoco/Trident.

(Doc. No. 51).

Thereafter, Ronnoco amended its complaint to correct its state of incorporation, withdraw its demand for a jury trial, and clarify its corporate structure by alleging additional facts regarding the existence of Trident HR Intermediate, LLC ("Trident Intermediate"), an intermediate holding company. (Doc. No. 66). Defendants moved for judgment on the pleadings, which was denied. (Doc. Nos. 82, 102).

The case proceeded as a bench trial on the merits on June 2 and 3, 2021. Ronnoco appeared by counsel John Comerford and James Martin; Defendants appeared by Zoom video conference and by counsel Mark Molner. Evidence and testimony were adduced. A transcript was prepared and has been made part of the record in this case. (Doc. Nos. 121, 122).[1] At the conclusion of trial, the Court found good cause to continue the preliminary injunction in full force and effect until further Order of the Court and ordered the parties to file proposed findings of fact and conclusions of law within thirty days. (Doc. No. 119).

On July 6, the parties submitted their proposed findings of fact and conclusions of law. (Doc. Nos. 125, 126). The same day, Ronnoco filed a motion for civil contempt against Defendants and their new employer, non-party Smart Beverage, Inc., d/b/a Thirsty Coconut ("Thirsty Coconut"). (Doc. No. 123). Ronnoco filed a second motion for civil contempt against

Defendant Torres and Thirsty Coconut on July 9, 2021. (Doc. No. 128). The motions for contempt are fully briefed and ready for disposition.

Having considered the arguments and evidence presented at trial and in the motion for permanent injunction, as well as the proposed findings of fact and conclusions of law submitted by the parties, the Court will deny Ronnoco's request for permanent injunction and motions for civil contempt.

## FINDINGS OF FACT

1.  Ronnoco is a Delaware limited liability company with its principal place of business in St. Louis, Missouri. Ronnoco is wholly owned by Ronnoco Holdings, Inc., which is in turn owned by Huron Capital Group. Ronnoco has sold and distributed coffee and other products in the United States for over 100 years. Over the years, it has expanded geographically and expanded its product offerings beyond coffee to include a variety of dispensed beverage items.

2.  In early 2020, Ronnoco acquired an indirect ownership interest in Trident Marketing, Inc. and Trident Beverage, Inc. (collectively "Trident"). Trident markets a line of 100% fruit juice beverage concentrates to the K-12 school markets. Prior to Ronnoco's acquisition of Trident, all of Trident's stock was owned by brothers John Walker and Patrick Walker.

3.  In structuring the acquisition, two new entities, Trident HR Holdings, LLC ("Trident Holdings") and Trident Intermediate, were formed. Trident Intermediate is wholly owned by Trident Holdings, its sole member. (Operating Agreement of Trident HR Intermediate, LLC, Dfts' Tr. Ex. 29). Neither Trident Holdings nor Trident Intermediate have any active employees. They conduct no business and own nothing other than shares of stock.

---

[1] Citations to the transcript are referenced as "Tr."

4.   The acquisition occurred as follows: (1) Trident's President, John Walker, and his brother and business partner, Patrick Walker, contributed 20% of their Trident stock to Trident Holdings and sold the remaining 80% of their shares to Trident Intermediate. (Acquisition Agreement, Dfts' Tr. Ex. 32, Sections 1.1(a), (b); Disclosure Schedule to the Acquisition Agreement, Pltfs' Tr. Ex. 82). The stock contribution allowed the Walkers to retain an equity interest in Trident post-acquisition. (Tr. Vol. II at 175:11-22). (2) Trident Holdings then contributed the Walkers' shares to Trident Intermediate, resulting in Trident Intermediate owning 100% of the common stock of Trident. (Acquisition Agreement, Section 1.1(c)). (3) Ronnoco then purchased 80% of the stock of Trident Holdings; the remaining 20% is retained by the Walkers through their respective LLC membership interests. (Amended and Restated Limited Liability Company Agreement of Trident HR Holdings, LLC, Dfts' Tr. Ex. 28).

5.   By virtue of Ronnoco's ownership of 80% of the stock of Trident Holdings; Trident Holdings' 100% ownership of Trident Intermediate; and Trident Intermediate's 100% ownership of the stock of Trident, Trident became an indirect subsidiary of Ronnoco. Trident, Trident Holdings, Trident Intermediate, and Ronnoco are legally separate and distinct entities.

6.   The evidence showed that by virtue of Ronnoco's acquisition, Trident employees, including Defendants, also became Ronnoco employees. Ronnoco's offerings were included in Trident's product catalog (Pltf's Tr. Ex. 68), and Ronnoco and Trident's salespeople began marketing coffee and other items for Ronnoco. Ronnoco and Trident also sold their products to each other at a 10% markup for resale along their existing channels. According to the evidence presented, sales of Ronnoco coffee to Trident amounted to a small percentage of Ronnoco coffee sales overall.

7.  Defendant Castagna was employed by Ronnoco and Trident as a Territory Manager in the greater Dallas/Ft. Worth, Texas area from March 17, 2020 to July 23, 2020. (Pltf's Tr. Ex. 4). Defendant Torres was employed by Ronnoco and Trident as a Territory Manager in the greater Los Angeles, California area from March 17, 2020 to July 16, 2020. (Pltf's Tr. Ex. 36). Before that, both Defendants were employed as Territory Managers by Trident for over three years.

8.  As a condition of their employment with Ronnoco, Defendants signed a Fair Competition Agreement (the "Agreement") on March 17, 2020, which is the contract at issue in this lawsuit. Both Defendants testified they read and understood the Agreement. The Agreement expressly prohibits Defendants from engaging in any business or activity that competes with "the business of" Ronnoco both during their employment and for two years after employment with Ronnoco:

> [d]uring my employment and for two (2) years thereafter, and within two hundred (200) miles of any of my work locations for the Company[2], I will not, directly or indirectly, for myself or on behalf of or in connection with any other person, entity or organization: (a) engage in any business or activity that is competitive with the business of the Company; (b) ... assist or be connected with (including, but not limited to, as an employee, consultant, or otherwise) any business that directly or indirectly competes or is seeking to compete with the business of the Company; and/or (c) undertake any efforts or activities toward commencing any business or activity that could be competitive with the business of the Company.

(Pltf's Tr. Exs. 5, 38 at ¶ 2).

9.  For purposes of the Agreement, any "business or activity" of Ronnoco includes "any business or activity in which [Ronnoco] is actually engaged" as well as any "prospective business or activity" of Ronnoco's that Defendants have actual knowledge of. (Id.). The Agreement defines "competition" to include any third party "which attempts to replace or

---

[2] The Agreement defines the "Company" to mean Ronnoco.

otherwise interfere with all or any portion of the existing or prospective business between [Ronnoco] and a third party." (Id.)

10.    The Agreement further prohibits Defendants from soliciting Ronnoco's employees, clients, or customers:

> During my employment and for two (2) years thereafter, I will not, directly or indirectly, for myself or on behalf of or in connection with any other person, entity or organization: (a) induce or attempt to induce any employee or consultant of the Company to leave the employ or services of the Company or in any way interfere with the relationship between the Company and any employee or consultant thereof; and/or (b) call on, solicit, have contact with, or service any client of the Company with whom I have had material contact, in order to (i) solicit business of the type provided by the Company, (ii) to induce or attempt to induce such person or entity to cease doing business with, or reduce the amount of business conducted with, the Company, or (iii) in any way to interfere with the relationship between any such person or entity and the Company.

(Id. at ¶ 3).

11.    The Agreement also prohibits Defendants from disclosing Ronnoco's confidential and proprietary information:

> I will keep confidential and not disclose or use, either during or after my employment, any Confidential Information of the Company, except as required in good faith in performing my employment duties for the Company or as authorized by the Chief Executive Officer of the Company in a signed writing addressed specifically to me. "Confidential Information" means any information that is used, developed, obtained or received by the Company in connection with the Company's customer or supplier relationships and its other trade secrets, including but not limited to the following: (a) client and prospective client information, including client lists, compilations of client data, client preferences, and personal and/or financial information relating to clients; (b) business information, including contractual arrangements, business plans, strategies, tactics, policies, procedures, resolutions, litigation or negotiations; (c) marketing information, including sales or product plans, strategies, tactics, methods, or market research data; (d) financial information, including costs and performance data, pricing information, sales figures, profit or loss figures, debt arrangements, equity structure, investors and holdings; (e) personnel information, including personnel lists, resumes, personnel data, organizational structure and performance evaluations; and (f) product or service information, such as drawings, schematics,

sketches, models, software, hardware, computer systems, source codes, suppliers, materials, equipment, research and development data, testing data, and other similar records. If ordered by a court of competent jurisdiction to disclose Confidential Information, I will provide written notice to the Company of such order immediately and cooperate in its efforts to safeguard such information. For the avoidance of doubt, Confidential Information does not include information in the public domain.

(Id. at ¶ 4).

12.  Defendants agreed to abide by these provisions when they signed the Agreement on March 17, 2020.

13.   By signing the Agreement Defendants also acknowledged that breach of any provision of the Agreement would result in immediate and irreparable harm to Ronnoco; that injunctive relief would not deprive them of an ability to earn a living because they are qualified for many positions which do not involve competing with Ronnoco; and that Ronnoco would be entitled to enforce the Agreement by injunction or other equitable remedies in the event of a breach (id. at ¶ 8); and agreed to pay Ronnoco's "reasonable legal fees and costs associated with any enforcement action," (id. at ¶ 9).

14.  In their positions as Territory Managers, first for Trident and then for Ronnoco and Trident, Defendants had access to confidential information in Trident's Quickbase program pertaining to its customers and products, including bidding and sales strategy, product lines, and customers' specific requirements and purchases. Defendants also had access to confidential business information belonging exclusively to Ronnoco. In April 2020, both Defendants attended a presentation by Ronnoco titled "Trident Beverage + Ronnoco Beverage Solutions Foodservice Intro." There, Ronnoco welcomed "Team Trident" and provided its new Territory Managers with

an overview of Ronnoco's food service channels, key high value/volume targets, account statistics, and sales strategies for coffee and juice in the food service industry. (Pltf's Tr. Ex. 12).

15.  On July 16, 2020, Torres left his employment with Ronnoco and Trident. Castagna left his employment with Ronnoco and Trident on July 23, 2020. Thereafter, Ronnoco learned that both Defendants had accepted employment with Thirsty Coconut, a direct competitor of Trident in the marketing of fruit juice beverages to school districts. The evidence established some overlap between the products offered in the Trident 2020-2021 product catalog and those offered by Thirsty Coconut, such as juice smoothie cups, juice pouches, and 100% juice concentrates served from dispensers. Thirsty Coconut had also been engaged in the sale of coffee products and coffee equipment; however, it ceased any coffee-related sales by 2019.

16.  On July 2, 2020, while still working for Ronnoco and Trident, Torres received an email on his personal email account from Thirsty Coconut employee Charles Peoples.[3] The email was addressed to Torres and Thirsty Coconut employees and attached a "list of potential clients nationally for our new Choice Partners Co-op relationship. You will have to scroll through the list to identify accounts in your respective territories. I did see members in each of your areas … We are known as Smart Beverage, Inc. to the membership." (Pltf's Tr. Ex. 48).

At some time after July 16, 2020, Torres began working for Thirsty Coconut. His territory for Thirsty Coconut includes his former territory for Ronnoco. (Tr. Vol. II at 44:5-13). It was Torres' testimony that at Thirsty Coconut, he has called on and serviced customers he formerly sold to and serviced at Trident and Ronnoco. (Id. at 82:14-23). The evidence also

---

[3] Peoples is the defendant in another lawsuit filed in this Court by Ronnoco against a former employee who went to work for Smart Beverage. See Ronnoco Coffee LLC v. Charles Peoples, Case No. 4:20CV1401-RLW (E.D. Mo.) (the "Peoples lawsuit").

showed several phone calls between Torres, Peoples, and Luke Einsel, President of Thirsty Coconut, in June 2020, prior to Torres' resignation from Ronnoco in July 2020. (Pltf's Tr. Ex. 48).

17.   On July 29, 2020, just six days after leaving Ronnoco's employ, Castagna emailed Peoples asking, "Do we have any brochures or documents I can send the districts other than the flavors? I have one that is having a meeting on Monday and would like something to present to the principals." (Pltf's Tr. Ex. 25). In October 2020, Castagna tried to sell on behalf of Thirsty Coconut to the Grapevine-Colleyville Independent School District, located twenty-four miles from Fort Worth, Texas, and a Trident customer. (Pltf's Tr. Ex. 31; Tr. Vol. I at 117:2-14). On November 10, 2020, Castagna wrote to a contact at a different school district in Texas: "I have switched companies and am no longer with Trident Beverage … I have attached the flavors I carry and would love to work with you again." (Pltf's Tr. Ex. 32). Castagna offered that potential customer a slightly lower price than Trident's price. (Tr. Vol. I at 120:13-20). Castagna's territory for Thirsty Coconut includes his former territory for Ronnoco. (Tr. Vol. I at 111:24-112:4). It was Castagna's testimony that at Thirsty Coconut, he has called on and serviced customers he formerly sold to and serviced at Trident and then at Ronnoco and Trident. (Id. at 117:3-10; 119:11-23).

18.   Ronnoco sent cease and desist letters to Defendants and Thirsty Coconut but received no response.

19.   At trial, Castagna admitted selling to and servicing a customer on behalf of Thirsty Coconut within 200 miles of his former territory for Ronnoco on March 29, 2021, after the TRO had been entered in this case. (Pltf's Tr. Ex. 75; Tr. Vol. I at 129:8-130:22).

## CONCLUSIONS OF LAW

20. The standard for determining whether a permanent injunction should issue is essentially the same as the standard for a preliminary injunction except that the movant must show actual success on the merits rather than a likelihood of success on the merits. Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church, 634 F.3d 1005, 1012 (8th Cir. 2011). "If a court finds actual success on the merits, it then considers the following factors in deciding whether to grant a permanent injunction: (1) the threat of irreparable harm to the moving party; (2) the balance of harms with any injury an injunction might inflict on other parties; and (3) the public interest." Oglala Sioux Tribe v. C & W Enters., Inc., 542 F.3d 224, 229 (8th Cir. 2008); Dataphase Sys., Inc. v. C.L. Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981). The Court therefore begins with the threshold question of whether Ronnoco has met its burden of showing actual success on the merits of its claims.

**(1)  Actual success on the merits**

The parties do not dispute that Missouri law applies to this action based on a choice of law provision in the Agreement. (Pltf's Tr. Exs. 5, 38 at ¶ 11).

**Breach of contract (Count I)**

21.  Under Missouri law, the essential elements of a breach of contract action are: "(1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff." Keveney v. Mo. Military Acad., 304 S.W.3d 98, 104 (Mo. 2010) (en banc). A plaintiff must "identify which rights or obligations [the defendant] breached under the contract in order to

establish a claim for breach of contract." Lucero v. Curators of Univ. of Mo., 400 S.W.3d 1, 5 (Mo. Ct. App. 2013) (quotation and citation omitted).

22.  The interpretation of a contract is a question of law in Missouri. Leggett v. Mo. State Life Ins., 342 S.W.2d 833, 850 (Mo. 1960) (en banc). The "cardinal principle for contract interpretation is to ascertain the intention of the parties and to give effect to that intent." Butler v. Mitchell-Hugeback, Inc., 895 S.W.2d 15, 21 (Mo. 1995) (en banc) (citing Royal Banks of Mo. v. Fridkin, 819 S.W.2d 359, 362 (Mo. 1991) (en banc)). It is presumed that the natural and ordinary meaning of the language used expresses the intent of parties to a contract. J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club, 491 S.W.2d 261, 264 (Mo. 1973) (en banc). "In interpreting a contract, [courts] must use the plain, ordinary, and usual meaning of the contract's words and consider the whole document." Butler, 895 S.W.2d at 21 (citing Royal Banks, 819 S.W.2d at 362).

23.  Missouri courts will enforce a non-competition agreement in limited circumstances that are "demonstratively reasonable." Whelan Sec. Co. v. Kennebrew, 379 S.W.3d 835, 841 (Mo. 2012) (en banc). "A non-compete agreement is reasonable if it is no more restrictive than is necessary to protect the legitimate interests of the employer." Id. at 842 (quoted case omitted). Further, under Missouri law, "a non-compete agreement is enforceable 'only to the extent that the restrictions protect the employer's trade secrets or customer contacts.'" Id. (quoting Healthcare Servs. of the Ozarks, Inc. v. Copeland, 198 S.W.3d 604, 610 (Mo. 2006) (en banc)). "The employer has the burden to prove that the non-compete agreement protects its legitimate interests in trade secrets or customer contacts and that the agreement is reasonable as to time and geographic space." Id.

24.   Here, the first element is met because the existence of the Agreement between the parties is undisputed, and the relevant terms of the parties' Agreement are set forth above. For the second element, Ronnoco tendered performance pursuant to the Agreement by, among other things, employing Defendants.

25.   As to the third element, Ronnoco alleges Defendants breached their Agreements by accepting work with a direct competitor, Thirsty Coconut, and helping it compete directly with Ronnoco for customer contracts by soliciting Ronnoco's customers. Ronnoco further alleges Defendants' actions caused, or will cause, Ronnoco to suffer lost profits. While acknowledging that Thirsty Coconut competes with Trident, Defendants argue that Thirsty Coconut is not a direct competitor of Ronnoco and, therefore, Defendants cannot be found in breach of their Agreements with Ronnoco by virtue of their employment with Thirsty Coconut.

26.   To enforce the Agreement, Ronnoco must prove it has a protectable interest. JTL Consulting, L.L.C. v. Shanahan, 190 S.W.3d 389, 397 (Mo. Ct. App. 2006). The Agreements between Ronnoco and Defendants prohibit Defendants from engaging in any business or activity that competes with "the business of" Ronnoco, defined as "any business or activity in which [Ronnoco] is actually engaged." Ronnoco contends that by virtue of its acquisition of an 80% ownership interest in Trident Holdings, it became "engaged" in the same business or activity in which Trident had been engaged, i.e., selling fruit juice beverages to school districts, as well as the majority owner of Trident's confidential information and trade secrets, namely Trident's client contact list and customer information. Defendants do not dispute that Ronnoco has a right to sue to enforce its own Fair Competition Agreement but challenge Ronnoco's standing as the

13

parent corporation of Trident to assert claims that belong to Trident, its indirect subsidiary, and a non-party to this action.[4]

27.   The issue of Ronnoco and Trident's corporate structure has been raised throughout this litigation and in the Peoples lawsuit. Ronnoco has consistently referred to itself as "Ronnoco/Trident," suggesting the two companies are one and the same. Ronnoco's breach of contract claim rests primarily on the fact that it owns 80% of Trident. Ronnoco contends that based on this ownership interest and its claimed entitlement to 80% of Trident's profits, Trident's business is also Ronnoco's business.

28.   In granting Ronnoco's motions for TRO and preliminary injunction, this Court agreed with the analysis of Judge White in the Peoples lawsuit, that by virtue of its 80% ownership interest in Trident Holdings, Ronnoco became "engaged" in the same business or activity as Trident, such that "the business of Ronnoco" now includes selling juice beverages to schools, and that Ronnoco was the majority owner of Trident Holdings' assets, i.e., confidential information and trade secrets. At that time, however, the record before this Court as well as the Court in the Peoples lawsuit suggested that Trident Holdings owned the assets of Trident and that Ronnoco owned 80% of Trident Holdings. New facts have since been discovered regarding

---

[4] Defendants challenge Ronnoco's standing to assert claims for breach of contract and misappropriation of trade secrets because Trident, not Ronnoco, possessed and owned the information allegedly misappropriated. The doctrine of standing relates to the justiciability of a claim necessary to satisfy the "case or controversy" requirement of Article III of the Constitution. See Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d 1114, 1126 (10th Cir. 2013), aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682 (2014). Neither party addresses the standard for determining Article III standing. Instead, Defendants' arguments appear to be a challenge to Ronnoco's ability to establish a prima facie claim of breach of contract and trade secret misappropriation and the Court has considered them as such. See Pioneer Int'l (USA), Inc. v. Reid, No. 2:07-CV-84-FTM -34DNF, 2007 WL 9718721, at *6 n.14 (M.D. Fla. Oct. 9, 2007).

Ronnoco's acquisition of Trident and, in particular, the existence of Trident Intermediate, a wholly owned subsidiary of Trident Holdings and the owner of 100% of the shares of Trident.

29.  In issues of corporate law, structure matters. Ronnoco's acquisition of Trident was structured as a stock purchase. A stock purchase is a purchase of the shares of a corporation, not its assets. In a stock purchase, the acquiring corporation becomes the parent, the selling corporation becomes the subsidiary, and the subsidiary continues intact. Corona v. Pac. Coast Bldg. Prod., Inc., No. C085128, 2021 WL 2548847, at *11 (Cal. Ct. App. June 22, 2021) (citations and internal quotations marks omitted). "By contrast, in an asset purchase, a corporation's business and assets can be acquired directly, leaving its share ownership unchanged." Id.

30.  It is a basic principle of corporate law that a subsidiary is a legal entity separate from its parent. Dole Food Co. v. Patrickson, 538 U.S. 468, 474 (2003). "A corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary; and, it follows with even greater force, the parent does not own or have legal title to the subsidiaries of the subsidiary." Laredo Ridge Wind, LLC v. Nebraska Pub. Power Dist., 11 4th 645, 651 (8th Cir. 2021) (quoting Dole Food, 538 U.S. at 474-75, citing 1 W. Fletcher, Cyclopedia of the Law of Private Corporations § 31, at 514 (rev. ed. 1999) ("The properties of two corporations are distinct, though the same shareholders own or control both. A holding corporation does not own the subsidiary's property.")); Hildene Opportunities Master Fund, Ltd. v. Arvest Bank, 897 F.3d 980, 986 (8th Cir. 2018) ("[P]arent companies do not own the assets of their subsidiaries."). "Legally, only the *shares* of a subsidiary may be considered an asset of the parent." Dole Food, 538 U.S. at 475) (emphasis in the original).

31. Missouri courts recognize and apply this principle. "Two separate corporations are regarded as wholly distinct legal entities, even if one partly or wholly owns the other." <u>Blanks v. Fluor Corp.</u>, 450 S.W.3d 308, 375 (Mo. Ct. App. 2014) (citing <u>Cent. Cooling & Supply Co. v. Dir. of Revenue, State of Mo.</u>, 648 S.W.2d 546, 548 (Mo. 1982)); <u>see</u> <u>Grease Monkey Int'l, Inc. v. Godat</u>, 916 S.W.2d 257, 262 (Mo. Ct. App. 1995) ("In the eyes of the law, two different corporations are two different persons. This is true even if one corporation is the sole shareholder of the other."); <u>Mitchell v. K.C. Stadium Concessions</u>, 865 S.W.2d 779, 784 (Mo. Ct. App. 1993). "Ownership of capital stock in one corporation by another does not itself create identity of corporate interest as between the two." <u>Cent. Cooling</u>, 648 S.W.2d at 548 (holding that transactions between a parent corporation and its subsidiary incur sales tax).

32. Because parent corporations are separate entities from their subsidiaries, they are unable to assert the interests of their subsidiaries. <u>See</u> <u>Schenley Distillers Corp. v. U.S.</u>, 326 U.S. 432, 435 (1946). "It is well established that a parent corporation and a subsidiary are in law separate and distinct entities, and under ordinary circumstances a contract in terms and in name with one corporation cannot be treated as that of both[.]" <u>Tennessee Valley Auth. v. Exxon Nuclear Co.</u>, 753 F.2d 493, 497 (6th Cir. 1985) (citing 1 W. Fletcher, Cyclopedia of the Law of Private Corps., § 43 (rev. perm. ed. 1983)); <u>Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.</u>, 2 F.3d 24, 26 (2e Cir. 1993) (same; citing 1 Fletcher Cyc. Corp. § 43 (perm. ed. 1990)). Because parent and subsidiary corporations are separate entities, it has been stated that "in no legal sense can … the business of a subsidiary corporation be said to be that of a parent." <u>Fluor Intercont'l, Inc. v. IAP Worldwide Servs., Inc.</u>, 533 F. App'x 912, 926-27 (11th Cir. 2013)

(Jordan, J., dissenting) (quoting <u>Conn. Gen. Life Ins. Co. v. Superintendent of Ins. of State of N.Y.</u>, 176 N.E.2d 63, 66–67 (N.Y. 1961)).

33.  Missouri courts require that the distinction between parent and subsidiary companies be maintained in the context of a contract and reject the theory that a parent corporation acquires rights solely by virtue of its ownership of a subsidiary. <u>See</u> <u>Mid–Missouri Tel. Co. v. Alma Tel. Co.</u>, 18 S.W.3d 578, 582-83 (Mo. Ct. App. 2000) (parent corporation could not ignore the legal distinction between itself and its wholly owned subsidiary, and thus could not acquire a contractual right that belonged to its subsidiary or assume a similar right by virtue of its ownership of the subsidiary).

34.  Here, Ronnoco is asserting its own contractual rights, not Trident's, as Ronnoco is a party to the Agreement and Trident is not. Ronnoco drafted the Agreement and entered into it with Defendants. Ronnoco did not include its subsidiary Trident as a party to the Agreement and did not define the term "Company" to include its subsidiaries, even though Defendants were employees of both Ronnoco and Trident.

In signing the Agreement, Defendants agreed not to compete with Ronnoco's business. Ronnoco maintains that by virtue of its acquisition of Trident, its business now includes Trident's business and sales and that it is the majority owner of Trident's confidential information and trade secrets. As discussed above, however, Ronnoco's ownership of 80% of the stock of Trident Holdings does not entitle it to assert the rights of Trident or establish its ownership of the alleged confidential information and trade secrets owned by Trident. To conclude otherwise would require the Court to disregard Ronnoco's and Trident's separate corporate structures and the independent existence of each entity. Thus, to the extent Ronnoco is

attempting to assert the interests of Trident, its subsidiary, by virtue of its acquisition of Trident, it is not permitted to do so. See Mid-Missouri Tel., 18 S.W.3d at 583.

35.  The Court has also considered, based on all the evidence of record, whether Ronnoco offered any other affirmative evidence that Trident's business can be considered "the business of Ronnoco." Apart from asserting that the sales and revenue from the K-12 market in Texas and California are Ronnoco's because it purchased and owns 80% of Trident, Ronnoco has no such evidence. Indeed, it was John Walker's testimony that Ronnoco does not sell juice to schools in Texas or California and is not a signatory on any contracts with schools in those states. According to Walker, all such contracts originated with and are owned by Trident. (Tr. Vol. II at 161:2-6; 167:20-168:22; 171:24-172:5). Moreover, the evidence tends to show that the business of Ronnoco and Trident are separate, based on the fact that Ronnoco and Trident purchase products from each other in inter-company transactions, paying each other a 10% profit. (Id. at 132:19-25).

36.  For these reasons, the Court concludes Ronnoco has not established that Defendants have engaged in any business or activity that competes with "the business of" Ronnoco, as opposed to the business of Trident. Ronnoco cannot sue for injuries to Trident's business, and the evidence does not establish injury to Ronnoco's business. See Whelan, 379 S.W.3d at 842 (A non-compete agreement is enforceable only to the extent the restrictions protect the employer's legitimate interests). Thus, Defendants are entitled to judgment on Ronnoco's breach of contract claims in Count I.

**Breach of the duty of loyalty (Count II)**

37.   In Missouri, a cause of action for breach of the duty of loyalty in the context of an employee acting in competition with his employer requires the following elements: "1) In general, an employee must not, while employed, act contrary to the employer's interest; 2) however, an employee may agree with others to compete upon termination of the employment and may plan and prepare for their competing enterprise while still employed; and 3) but an employee may not, while still employed, go beyond mere planning and preparation and act in direct competition with the employer." Scanwell Freight Express STL, Inc. v. Chan, 162 S.W.3d 477, 481 (Mo. 2005) (en banc) (citations omitted). The duty of loyalty is separate and distinct from the employment contract a defendant has with his employer. Curators of Univ. of Mo. v. Suppes, 583 S.W.3d 49, 66 (Mo. Ct. App. 2019).

Ronnoco contends Torres breached his duty of loyalty when he began working for Thirsty Coconut, a direct competitor, while still employed by Ronnoco and Trident. As discussed above, however, the evidence failed to show that Ronnoco (as opposed to Trident) and Thirsty Coconut directly compete.

38.   Ronnoco contends that independent of its ownership interest in Trident, Thirsty Coconut directly competes with Ronnoco in the sale of juice and other beverages directly to convenience stores and in the sale of identical cartridge-based juice machines. The only evidence on this point is John Walker's testimony that Ronnoco directly services "one or two or maybe more" convenience stores in Texas. (Tr. Vol. II at 160:24-161:1). According to Luke Einsel, President of Thirsty Coconut, Thirsty Coconut's business with convenience stores is limited primarily to equipment repair; it does not engage in direct distribution to convenience stores. (Tr.

19

Vol. I at 35:14-36:7). In addition, Einsel testified that Thirsty Coconut stopped selling coffee products in 2019 and liquidated its coffee serving equipment shortly thereafter. Without more, this is insufficient to establish that Ronnoco and Thirsty Coconut directly compete. Ronnoco therefore does not establish a breach of the duty of loyalty owed to it. Thus, the claim fails.

**Missouri Uniform Trade Secrets Act (Count III)**

39.  To establish a violation of the Missouri Uniform Trade Secrets Act ("MUTSA"), Mo. Rev. Stat. § 417.450, et seq., a plaintiff must demonstrate "(1) the existence of a protectable trade secret, (2) misappropriation of those trade secrets by Defendants, and (3) damages." Secure Energy Inc. v. Coal Synthetics, LLC, 708 F. Supp. 2d 923, 926 (E.D.  Mo. 2010).

40.  Ronnoco alleges that while the Defendants were employed by Ronnoco, they had access to confidential information in Trident's Quickbase program pertaining to customer contacts, client lists, and confidential business information such as pricing, product lines, and contract bidding strategy. Defendants argue that as the parent corporation, Ronnoco does not have legal title to the assets of Trident, its subsidiary, and therefore has no protectable interest in Trident's trade secrets. Ronnoco does not contend that Defendants misappropriated trade secrets from Ronnoco itself. Although there was evidence that Defendants attended a presentation by Ronnoco in April 2020 that provided new Territory Managers with an overview of Ronnoco's food service channels, account statistics and sales strategies for juice and coffee in the food service industry, there was no evidence of misappropriation of this information by Defendants.

41.  Ronnoco concedes the alleged trade secrets "reside" with Trident but assert that because Trident is "wholly-owned" by Ronnoco, it has an ownership interest in them. Ronnoco relies on Applied Materials, Inc. v. Advanced Micro-Fabrication Equip. (Shanghai) Co., LTD,

No. C 07-05248 JW, 2009 WL 10692715, at *1 (N.D. Cal. Nov. 30, 2009), for the proposition that a parent corporation has an ownership interest in the trade secrets of its wholly owned subsidiary, and on Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752, 771 (1984), which held that a parent and its wholly owned subsidiary have "a complete unity of interest." Ronnoco contends Trident is its "wholly-owned" subsidiary because it is owned by Ronnoco and the Walkers – purported Ronnoco employees who operate the "merged" business – but has provided no legal support for this contention. Moreover, Ronnoco's reliance on Copperweld, which held that coordinated activity of a parent and its wholly owned subsidiary must be viewed as a "single enterprise" for purposes of section 1 of the Sherman Act, is unavailing as these circumstances do not exist in this case.

42.  Upon consideration of the record, the Court finds Ronnoco has failed to demonstrate actual success on the merits of its MUTSA claim. Assuming without deciding that Trident's client contacts list, customer information, and information on pricing and product lines are protectable trade secrets, as discussed above, Ronnoco's ownership of 80% of the stock of Trident Holdings does not establish its possession and ownership of the alleged confidential information owned by Trident. Dole Food, 538 U.S. at 474-75 ("A corporate parent which owns the shares of a subsidiary does not, for that reason alone own or have legal title to the assets of the subsidiary[.]"). Moreover, Ronnoco has made no showing of misappropriation of trade secrets belonging to Ronnoco apart from its ownership interest in Trident. Thus, Defendants are entitled to judgment on Ronnoco's MUTSA claim in Count III.

43.  For these reasons, the Court finds and concludes that Ronnoco has not met its burden of demonstrating actual success on the merits of its claims. Without success on the merits, the

Court finds it unnecessary to address the remaining <u>Dataphase</u> factors for injunctive relief, and Ronnoco's claim for a permanent injunction based on these claims fails. <u>Oglala Sioux Tribe</u>, 542 F.3d at 233; <u>Planned Parenthood Minnesota, N. Dakota, S. Dakota v. Rounds</u>, 530 F.3d 724, 732 (8th Cir. 2008). Accordingly, Ronnoco's claim for injunctive relief will be dismissed.

44.   Because Ronnoco is not entitled to a permanent injunction, the Court's preliminary injunction necessarily falls. <u>Pac. Gamble Robinson Co. v. Minneapolis & St. Louis Ry. Co.</u>, 92 F. Supp. 352, 354 (D. Minn. 1950). Accordingly, the Court will vacate its preliminary injunction order.

**Motions for contempt**

45.   More than a month after the completion of trial and conclusion of the evidence, Ronnoco moved this Court for orders of contempt against Defendants and Thirsty Coconut for violating the terms of the Court's TRO and Preliminary Injunction and the terms of their Agreements with Ronnoco. In its first motion for contempt, Ronnoco specifically alleges that Castagna continued to work for Thirsty Coconut after this Court's entry of its Order enjoining Defendants from doing so. At trial, Castagna admitted completing a sale to the Vernon Independent School District, located within 200 miles of his former territory for Trident and then Ronnoco and Trident, on March 29, 2021, after entry of the March 5, 2021 TRO. (Tr. Vol. II at 26:4-27:2; 37:3-38:20; 41:6-42:19).

Ronnoco further alleges that on June 29, 2021 and July 2, 2021, Torres and Einsel, respectively, solicited a Ronnoco employee to leave Ronnoco and go to work for Thirsty Coconut. In support of its allegations, Ronnoco submits the declaration of James Morris, an employee of Ronnoco and Trident based in California, detailing communications he received

from both Torres and Einsel about joining Thirsty Coconut and moving to the Kansas City area. (Doc. No. 124-1). This evidence, submitted after the trial was concluded, was not part of the trial record and thus cannot be considered by the Court. Although Ronnoco included the employee non-solicitation language from the Agreement in its complaint, it did not seek injunctive relief on that basis or assert it as a basis for its breach of contract claim.

In its second motion for contempt, Ronnoco alleges that on July 7, 2021, Torres solicited El Dorado High School, a current customer of Ronnoco and Trident in California, to do business with Thirsty Coconut. (Doc. No. 129-1). As damages Ronnoco seeks any profits attributable to Defendants' work since the entry of the Court's Orders as well as its attorneys' fees in connection with its motions.

46.   Compensatory and coercive civil contempt sanctions do not survive if the underlying injunction is vacated because it was issued erroneously. "'The right to remedial relief falls with an injunction which events prove was erroneously issued[.]'" Klett v. Pim, 965 F.2d 587, 590 (8th Cir. 1992) (quoting United States v. United Mine Workers of Am., 330 U.S. 258, 295 (1947) (citations omitted). The Eighth Circuit recently reaffirmed this principle in Sisney v. Kaemingk, 15 F.4th 1181, 1200 (8th Cir. 2021) ("a [civil] contempt sanction compensating the movant for damages incurred as a result of the offending party's noncompliance while the order was in effect remains appropriate even after the order is no longer in effect, unless the order was 'vacated because it was issued erroneously.'") (quoting Klett, 965 F.2d at 590) (emphasis added). See also Hampton Tree Farms, Inc. v. Yeutter, 956 F.2d 869, 871 (9th Cir. 1992) (finding that "once an injunction in a civil case has been invalidated, rights granted under the injunction no longer exist and cannot be enforced"); Blaylock v. Cheker Oil Co., 547 F.2d 962,

966 (6th Cir. 1976) (recognizing and applying United Mine Workers rule); Latrobe Steel Co. v. United Steelworkers, 545 F.2d 1336, 1345 (3d Cir. 1976) (affirming rule that "compensatory civil contempt does not survive the abrogation of the underlying decree"); Pac. Gamble, 92 F. Supp. at 354 ("The vitality of a temporary injunction is derived from the pendency of the main action. It is ancillary thereto. And its ultimate and basic validity, as well as any contempt orders predicated thereon, necessarily depends upon the outcome of the main action. [I]f … the trial on the merits disclosed that plaintiff was not entitled to a permanent injunction, then the temporary injunction would necessarily fall, together with any and all rights to enforce civil contempt for any disobedience.").

This authority controls here. The Court has vacated the preliminary injunction as erroneously entered because Ronnoco did not prevail on the merits of the claims on which the injunctive relief was based. The Court notes that throughout this litigation, Defendants and Thirsty Coconut have exhibited a disregard for this Court's Orders, of which they were aware, and the Agreements Defendants signed and agreed to. Nevertheless, the Court must deny Ronnoco's motions for civil contempt because there is no basis for either a coercive or compensatory contempt citation under the precedent discussed above.

**Conclusion**

For the reasons discussed herein, the Court concludes that Plaintiff Ronnoco Coffee LLC failed to meet its burden to establish its entitlement to judgment on any of the claims in its Amended Complaint. Defendants Castagna and Torres are therefore entitled to judgment. The Court will vacate the Preliminary Injunction Order as having been erroneously entered and deny Ronnoco's motions for civil contempt.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff Ronnoco Coffee LLC's request for permanent injunction is **DENIED** and the Court's Preliminary Injunction Order [51] is **VACATED.**

**IT IS FURTHER ORDERED** that Plaintiff Ronnoco Coffee LLC's Motion for Civil Contempt [123] and Second Motion for Civil Contempt Directed to Defendant Jeremy Torres and Non-Party Thirsty Coconut [128] are **DENIED.**

**IT IS FURTHER ORDERED** that all claims asserted by Plaintiff Ronnoco Coffee LLC against Defendants Kevin Castagna and Jeremy Torres are **DISMISSED WITH PREJUDICE.**

Dated this 16th day of December, 2021.

_John A. Ross_
**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**